IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| THERESA DIAZ, § | |
| § | |
| Plaintiff, § | |
| § | |
| V. § | CIVIL ACTION NO. 4:16-cv-00539 |
| § | |
| CAROLYN W. COLVIN, ACTING § | |
| COMMISSIONER OF THE SOCIAL § | |
| SECURITY ADMINISTRATION, § | |
| § | |
| Defendant. § | |

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 20) and Defendant's Cross Motion for Summary Judgment and Memorandum in Support (Document No. 21). Having considered the Cross Motions for Summary Judgment, each sides' response to the other's motion (Document Nos. 22 & 23), the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 20) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 21) is DENIED, and this decision of the Commissioner is AFFIRMED.

---

[1] On July 11, 2016, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 11.

## I. Introduction

Plaintiff Theresa Diaz ("Diaz") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner for the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits. Diaz argues in this appeal that: "The ALJ's rejection of the opinions from Diaz's treating physicians and his reliance on the opinion of the testifying medical expert are not supported by substantial evidence." The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's decision, that the decision comports with applicable law, and that the decision should be affirmed.

## II. Procedural History

On or about February 6, 2013, Diaz filed an application for disability insurance benefits ("DIB"), alleging disability beginning December 7, 2012, as a result of lupus, neuropathy, anxiety, renal insufficiency, hypertension and migraines (Tr. 91). The Social Security Administration denied the application initially on March 7, 2013, and upon reconsideration on April 17, 2013. (Tr. 23). After that, Diaz requested a hearing before an ALJ. The Social Security Administration granted her request and the ALJ, Paul W. Schwartz, held a hearing on March 24, 2014 and July 7, 2014, at which Diaz's claims were considered *de novo*. (Tr. 50-84). Thereafter, on August 27, 2014, the ALJ issued his decision finding Diaz not disabled. (Tr. 30).

Diaz sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in

2

reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 416.1470. On September 9, 2015, the Appeals Council found no basis for review (Tr. 1-4), and the ALJ's decision thus became final.

Diaz filed a timely appeal of the ALJ's decision. 42 U.S.C. § 405(g). Both sides have filed a Motion for Summary Judgment, each of which has been fully briefed. The appeal is now ripe for ruling.

### III. Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v. Apfel*, 174 F.3d 692,

693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edision Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

### IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

Here, the ALJ, in the August 27, 2014 decision, found at step one that Diaz had not engaged in substantial gainful activity since December 7, 2012, her alleged onset date. (Tr. 25).

At step two, the ALJ determined that Diaz had the following severe impairments: "systemic lupus erythematosus, kidney disease, hypertension, chronic obstructive pulmonary disease, and obesity." (Tr. 25). At step three, the ALJ determined that Diaz did not have an impairment or a combination of impairments that met or equaled a listed impairment. (Tr. 26). Prior to consideration of step four, the ALJ determined that Diaz had the "residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c)." (Tr. 27). Using that residual functional capacity assessment and relying on the testimony of a vocational expert, the ALJ concluded, at step four, that Diaz could perform her past relevant work as a certified nurse assistant, and that she was therefore not disabled. (Tr. 30).

In this appeal, Diaz argues that: The ALJ's rejection of the opinions from Diaz's treating physicians and his reliance on the opinion of the testifying medical expert are not supported by substantial evidence.

In determining whether there is substantial evidence to support the ALJ's ultimate disability decision, the court generally considers four factors: (1) the objective medical facts, (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren*, 925 F.2d at 126. But, because Diaz raises only one issue in this appeal, related to the weight given by the ALJ to the expert medical opinions in the record, it is the expert medical opinion factor, and the objective medical evidence related thereto, that will form the basis of the discussion herein.

## V. Discussion

Diaz's arguments on appeal, and her complaints about the ALJ's consideration of the expert medical opinions in the record, center around her systemic lupus erythematosus, hypertension, and renal insufficiency. It is, therefore, the objective medical evidence related to those impairments that is chronicled below.

On April 8, 2012, Diaz reported left lower quadrant abdominal pain with nausea and an emergency room doctor observed she had an unsteady gait and appeared to be in distress due to pain. (Tr. 397). Her kidneys were found to be normal. (Tr. 418). On May 24, 2012, Diaz reported lower back pain that was in the left side of her lower back with numbness and tingling; treating physician Christopher Imperial, D.O., observed moderate paraspinal spasm, normal bilateral lower extremities, and diminished ankle jerk on left reflexes. (Tr. 532). On September 20, 2012, Diaz reported she had had lupus since 2006 with usual symptoms of joint pain and fatigue. (Tr. 501). Nancy Scheinost, M.D., a rheumatologist, observed Diaz's extremities were dusky, she had crepitus in her bilateral knees, and her gait was slow. (Tr. 502). Laboratory results from September 21, 2012 showed low albumin levels. (Tr. 473).

From December 4 to 7, 2012, Diaz remained in the hospital at St. Joseph Regional Health Center in Bryan, TX due to chest pain, dyspnea, elevated blood pressure, and hypertensive urgency. (Tr. 355-384). Her severity of pain was rated a 9 out of 10. (Tr. 378). Myocardial infarction was ruled out, and her discharge diagnoses included lupus pericarditis, hypertension, systemic lupus erythematosus, hypothyroidism, anxiety, migraine, and renal insufficiency. (Tr. 355). Dr. Imperial wrote the discharge summary and included Dr. Gutierrez as Diaz's consulting cardiologist and Dr. Tan as Diaz's consulting nephrologist. *Id.* According to Dr. Imperial's discharge summary, Diaz had been under extreme stress from family and work. *Id.* Diaz

underwent an echocardiogram which revealed a slight pericardial effusion, which was believed to be due to her lupus. *Id.* Dr. Tan, who saw Diaz while she was hospitalized, felt like her renal insufficiency and proteinuria were likely due to both a pre-renal component from her elevation in blood pressure, as well as her lupus. (Tr. 356). A bilateral renal ultrasound found no significant abnormalities. (Tr. 554). Diaz was given oral steroids, continued on her other medications, and had, upon discharge, significant improvement of her pain, as well as her other symptoms, with a stabilization of her blood pressure. (Tr. 356).

At a follow-up visit with Dr. Imperial on December 10, 2012, no significant findings were noted, and Diaz was continued on her prescribed medications of Plaquenil for her lupus, Amlodipine, Aspir, Coreg, Chlorthalidone and Zestrik for her hypertension, and Vicodin, Ibuprofen and Nexium for her pericarditis. (Tr. 538-39). On follow-up with Dr. Tan on January 2, 2013, Diaz's proteinuria was attributed to her lupus, and no need was seen for a renal biopsy at the time. (Tr. 572).

From January 18 to 22, 2013, Diaz was again hospitalized at the St. Joseph Regional Health Center due to hypertensive urgency, possible lupus nephritis, nephrotic syndrome, and hypertension. (Tr. 42-43). Upon consultation with Dr. Tan, a renal biopsy was performed. In addition, Diaz's medications were adjusted to help control her blood pressure. Upon discharge, her condition was stable.

At a follow-up visit with Dr. Tan on January 30, 2013, the results of the renal biopsy were noted ("moderate chronicity and moderate activity") and Diaz was started on CellCept (an immunosuppressant). (Tr. 570-571). There was some edema noted in her extremities but her hypertension was under good control at the time. *Id.* At a follow-up visit with Dr. Imperial the next day, no edema was noted, and Diaz was continued on the medications for her lupus and

hypertension, as well as citalopram and ambien for her anxiety. (Tr. 543-44). Close to a month later, on February 20, 2013, Dr. Tan noted that Diaz was feeling tired and had occasional diarrhea from the CellCept, but she was "tolerating it." (Tr. 568-69). She still had "significant proteinuria," but it had fallen to the "subnephrotic range." *Id.* A follow-up with Dr. Imperial on February 22, 2013, revealed a normal range of motion in all of Diaz's joints (upper/lower extremity). (Tr. 608-610). She was continued on her medications and instructed to return in a month. *Id.*

On March 21, 2013, Dr. Imperial observed that Diaz's knees and legs were red and swelling, Diaz had a decreased range of motion in her knee joints, and Diaz reported that her knees had buckled and given out, causing her to fall. (Tr. 513-514). Thereafter, on April 1, 2013, and April 16, 2013, Dr. Imperial noted no edema. (Tr. 511, 516).

In a nephrology assessment dated April 24, 2013, Dr. Tan noted that Diaz had trace edema, her current lab results showed urine protein level of 401, and her urine protein-creatinine ratio was higher than it was in her last visit. (Tr. 662-63). That higher protein excretion was believed to be the result of the recent decreased dose of CellCept. *Id.* At that time, Dr. Tan determined that Diaz's renal function was "stable", and that control of her hypertension was "excellent." (Tr. 662).

In a follow-up visit with Dr. Imperial on June 19, 2013, scattered patches of red lesions were observed on Diaz's legs, but Diaz's appearance was well-developed and well-nourished, and she showed no edema. (Tr. 603). A month later, on July 24, 2013, Dr. Tan observed Diaz had +1 edema, and lab findings of her urine protein levels were 363; Dr. Tan diagnosed Diaz with stage 1 chronic renal failure, with nephrotic range proteinuria, and agreed that Diaz's dose of CellCept could be increased since "patient is still spilling protein." (Tr. 660-61). On

September 12, 2013, Dr. Imperial again observed no edema, but Diaz's albumin level was low at 3.0. (Tr. 598, 694). On December 9, 2013, Dr. Tan found that Diaz was doing well overall, and there was only trace edema in her extremities. (Tr. 670-71). Dr. Tan increased Diaz's dosage of CellCept. *Id.*

Upon follow-up with Dr. Imperial on November 20, 2013, for medication maintenance, Diaz reported some joint pain and stiffness, and some intermittent chest pain. (Tr. 675-77). Upon physical examination, some scattered patches of red lesions were noted on Diaz's legs, there was no edema in her extremities, and her neurologic gait and station were normal. *Id.* Diaz was continued on most of her medications, but some of her hypertension medications were adjusted. *Id.* On December 16, 2013, Diaz was seen by Dr. Imperial for a back strain, which he treated with pain and muscle relaxant medications. (Tr. 678-79). On January 27, 2013, at her next visit with Dr. Imperial, Diaz continued to complain of joint pain and stiffness, chest pain that comes and goes, as well as some joint swelling, and fatigue. (Tr. 689-90). Dr. Imperial noted upon examination that Diaz was overweight, there were scattered patches of red lesions on her legs, her gait was normal, she showed no edema, and her EKG showed no change since 2012. *Id.*

On January 31, 2014, Diaz arrived to the ER with a headache, a steady gait, her skin was warm and dry, she rated her pain a 7 out of 10, and there was no numbness in her upper/lower extremities. (Tr. 703). She was treated with pain medications and discharged the same day. (Tr. 709-710).

On February 20, 2014, Diaz was again seen by Dr. Imperial, complaining about leg edema, left-sided chest pain with shortness of breath. (Tr. 737-38). Dr. Imperial noted a few red

patches on her face and extremities, and "pitting" edema of the legs bilaterally. *Id.* He prescribed an increase in Lasix and the addition of Zaroxolyn. *Id.*

On February 25, 2014, Diaz was seen by Dr. Scheinost, her rheumatologist, for a re-evaluation of her lupus. (Tr. 721-725). At that visit, Diaz complained of shortness of breath and some chest pain, joint stiffness, pain and swelling. Dr. Scheinost found, upon physical examination, however, that Diaz had full range of motion in her right and left shoulder, right hand and wrist, and left wrist, with some tenderness and a reduced range of motion in her left hand. Diaz was continued on the medications for her lupus, and instructed to follow-up with Dr. Tan for her renal insufficiency, and Dr. Gutierrez for her chest pain.

On March 11, 2014, at her next visit with Dr. Tan, Diaz had some leg swelling and "presumably still a significant proteinuria." (Tr. 747-48). Dr. Tan diagnosed Diaz with "[n]ephrotic range proteinuria from lupus nephritis – Still at stage 2 chronic renal failure" and planned to "max out the CellCept" and possibly increase her edarbi. *Id.*

With this medical evidence providing a backdrop, Diaz argues in her Motion for Summary Judgment that the ALJ erred in giving greater weight to the opinion of the testifying medical expert, Dr. Woodrow Janese, than the opinions of her treating physicians, Drs. Imperial and Tan. According to Diaz, the ALJ did not explain, by reference to the objective medical evidence, why he credited the opinion of Dr. Janese over the opinions of Drs. Imperial and Tan, did not explain how her reported daily activities were inconsistent with the opinions of Drs. Imperial and Tan, and improperly focused on her alleged failure to conform with prescribed treatment in giving less weight to the opinions of Drs. Imperial and Tan.

Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of

11

time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1079 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).

Here, the expert medical opinions from Drs. Imperial and Tan as to Diaz's ability to engage in work related activities are contained in: (1) a May 28, 2013 "Medical Form" and accompanying "Multiple Impairment Questionnaire," completed by Dr. Imperial; (2) a October 7, 2013, "Kidney Disease Impairment Questionnaire," completed by Dr. Tan; and (3) an April of 2015, "To Whom it May Concern" letter authored by Dr. Imperial. In his May 28, 2013, opinion, Dr. Imperial noted that the onset of Diaz's impairments was 2006, that Diaz had significant joint pain during the day, and that Diaz was disabled, with her disability expected to last 12 months or longer. (Tr. 597). He also noted that Diaz had lupus complicated by pericarditis, nephritis, arthritis, and she had hypertension; her primary symptoms included joint pain in hands and legs, weakness of hands, fatigue, chest pain, and her level of pain was 7-8 out of 10, fatigue was 5-6 out of 10, and in an 8-hour day, Diaz could only sit for 5-6 hours and

12

stand/walk for 1-2 hours. (Tr. 589-96). Dr. Imperial opined that Diaz could never lift nor carry anything 5 pounds or more, that Diaz would have marked limitation in an 8-hour workday using her upper extremities, and that she would need to take unscheduled breaks to rest at unpredictable intervals during an 8-hour working day every 2-3 hours and rest would last an average of about 30 minutes before returning back to work. *Id.*

In his October 7, 2013, opinion, Dr. Tan wrote that Diaz had chronic renal failure, with clinical findings of fatigue and edema. (Tr. 654-658). He opined that in an 8-hour day Diaz could only stand or walk for a total of one hour, that it would be medically necessary for Diaz to get up and move around once every hour for 15 minutes before sitting again, that she could frequently lift or carry up to 10 pounds, could occasionally lift or carry up to 20 pounds, but could never lift or carry 20 pounds or more, that Diaz's impairments could be expected to last at least twelve months, and that Diaz would have to elevate her legs while in a seated position once every 4 hours on average for 15 minutes. *Id.*

Finally, in April of 2015, Dr. Imperial wrote in a "To Whom it May Concern" letter about Diaz's condition, that "she was deemed unable to work due to the stress causing exacerbations of her inflammatory illness", yet "she is relatively stable at this time on her current medication regimen." (Tr. 753).

In contrast to these written opinions from Drs. Imperial and Tan on medical impairment "forms", Dr. Janese testified that the administrative hearing that none of Diaz's impairments met a listing, and that Diaz's "exertional presentations," as reflected in her medical records, did not evidence any physical limitations associated with her impairments. (Tr. 76-80). Dr. Janese opined that Diaz had an RFC for medium work.

13

In considering and weighing the expert medical opinions in the record, and favoring the opinion of Dr. Janese over the opinions of Drs. Imperial and Tan, the ALJ wrote:

> As for the opinion evidence, great weight is given to the opinion of the testifying medical expert, Dr. Woodrow [Janese], M.D., who opined that due to the lack of objective criteria being established, the claimant's alleged limitations are not established or corroborated by the record. The undersigned finds ample support for this opinion and evaluation in the record, as the treatment options pursued by the claimant appear to be reasonable effective and compounded by the fact that the claimant has not adhered particularly well to medical directives, indicates that her currently alleged symptoms are not of the severity or persistence portrayed.
>
> Consequently, minimal weight is given to the submitted opinion evidence of the treating doctor, opining that the claimant is unable to lift more than five pounds, stand or walk, greater than two hours, or otherwise complete a full eight-hour workday (Exhibit 3F, p. 6; 5F; 6F; 7F, p. 12). Further, it is noted that another treating doctor wrote that the claimant could lift up to 20 pounds, however, also opined that she would need extended breaks every hour (Exhibit 8F). These opinions are not consistent with the claimant's originally reported activities of daily living, displayed independence, or clinical evaluations that show far greater functioning and mobility than suggested by the claimant or her treating doctors. For example, as of early 2013, she was independent with grooming and self-care, cooked meals, ironed, shopped for the household, attended church, and drove a vehicle (Exhibit 5E; 8E). These activities are inconsistent with her reported limitations and indicate that, at baseline, she is able to perform a range of exertional activities consistent with the residual functional capacity assessed herein.

The ALJ's consideration of the competing expert medical opinions in the record as well as the minimal weight he gave to the opinions of Drs. Imperial and Tan was neither erroneous nor improper.

Diaz' first argues that because Dr. Tan was a medical specialists in an area related to her impairments (nephrology), and Dr. Janese was not, the ALJ's reliance on Dr. Janese's opinions was erroneous. A specialist's opinion is generally to be accorded more weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). However, a specialist's opinion only tends to be given higher weight "generally," *id.; see also Carrier v. Sullivan* 944 F.2d 243, 246 (5th Cir. 1991) (ALJ may

accept better-supported non-examiner physician's opinion over opinion of a treating physician), and "'the Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d at 176 (quoting Bradley v. Bowen, 809 F.2d 1054, 1057 (5th Cir. 1987)). Here, despite the fact that Dr. Janese was not a nephrologist, the ALJ explained why he credited Dr. Janese's opinions over that of Dr. Tan. The mere fact that Dr. Tan was a specialist did not render his opinions unimpeachable.

Diaz next argues that the ALJ did not explain how Diaz's reported daily activities were inconsistent with the limitations opined about by Drs. Imperial and Dr. Tan, citing *Campbell v. Barnhart*, 374 F.Supp.2d 498, 504 (E.D. Tex. 2005) as support for her argument that the ALJ erred thereby. *Campbell* is, however, is not applicable because it dealt with an ALJ's failure to address a treating physician's opinion that the claimant's ability to function waxed and waned, and because the ALJ failed to analyze how much weight to afford the treating physician's opinion. Here, the ALJ did weigh, and explain the weight he assigned, the various expert medical opinions in the record. In addition, unlike *Campbell*, where it was not self-evident whether the claimant's reported daily activities affected her ability to work on a regular and sustained basis, the activities of daily living Diaz reported when she filed her social security applications[2] are inconsistent with the opinions of Drs. Imperial and Tan that Diaz has extreme physical limitations.

A review of the record reveals that the opinions of Drs. Imperial and Tan were mostly placed in check-mark form supplemented with brief explanations. It is not improper for an ALJ to assign little weight to an opinion which is brief, conclusory and not supported by objective

---

[2] In the Function Report she completed with her application for disability insurance benefits, Diaz stated that she prepares "regular meals" five days a week, does laundry, sweeps, and some ironing, can shop for groceries once a week for an hour at a time, reads, watches, tv, and goes to church on Sundays. (Tr. 271-275).

tests and examinations. *Foster v. Astrue*, 410 Fed. Appx. 831 (5th Cir. 2011). Moreover, the record as a whole does not corroborate the opinions of Drs. Imperial and Tan as Diaz's heart rate and peripheral pulses were determined to be mostly normal, her lungs were shown to be clear (Tr. 515, 542, 600, 610, 723, 739, 746), and multiple physical examinations revealed that she was capable of a full range of motion in all of her major joints including her hands and was capable of ambulating normally (Tr. 600, 609, 723, 747). This objective medical evidence is not consistent with the opinions of the treating physicians as to her physical limitations. The minimal weight given by the ALJ to those medical opinions on that basis is therefore supported by the record. It is also supported by the fact that the opinions of Drs. Imperial and Tan are not even consistent with themselves. Dr. Imperial opined that Diaz is unable to lift more than five pounds, where Dr. Tan opined that she could lift up to twenty pounds (Tr. 589-596, 597, 609, 654-669). The treating physicians' opinions also diverged with regards to her ability to stand or walk with Dr. Imperial stating that she could not stand longer than two hours and Dr. Tan opining that she would need extended breaks every hour. *Id.* The inconsistency of the treating physicians' opinions also supports the ALJ's decision to assign those opinions less weight.

As for Diaz's complaints about the ALJ's reference to, or reliance on, her failure to lose weight and/or stop smoking, while it is true that general recommendations that a claimant lose weight or stop smoking are not considered "prescribed treatment," the ALJ did not base the weight he assigned her treating physicians' opinions on Diaz's failure to follow prescribed treatment. Instead, the ALJ merely noted, as was within his province to do, that Diaz's failure to lose weight and/or stop smoking was some reflection on whether her impairments were as limiting as alleged. In that sense, the ALJ did not err in considering her alleged limitations or in formulating an RFC.

In all, the record shows that the ALJ's consideration of the expert medical opinions in the record was proper under *Newton* and SSR 96-2p. The record also shows that the ALJ's RFC, which was supported by the expert medical opinion of Dr. Janese, in connection with the vocational expert's testimony applying that RFC to Diaz's past work, constitutes substantial evidence that supports the ALJ's decision. The ALJ's decision will therefore be affirmed.

**VI.    Conclusion and Order**

Based on the foregoing, and the conclusion that the ALJ did not err in his consideration of the expert medical opinions in the record, including those of Diaz' treating physicians, and that substantial evidence supports the ALJ's decision, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 20) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 21) is DENIED, and the decision of the Commissioner is AFFIRMED.

Signed at Houston, Texas, this 5th day of September, 2017.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE